Anthony PORTER, Petitioner–Appellant,

v.

Richard B. GRAMLEY, Warden, Pontiac Correctional Center, Respondent–Appellee.

No. 96–2205.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1997.

Decided April 25, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied June 17, 1997.

Kenneth N. Flaxman (argued), Lesley A. Redman, Chicago, IL, for Petitioner–Appellant.

Steven R. Splitt, Office of the Attorney General, Criminal Appeals Division, Linda Woloshin (argued), Cook County State's Attorney, Chicago, IL, for Respondent–Appellee.

Before FLAUM, KANNE, and EVANS, Circuit Judges.

KANNE, Circuit Judge.

Anthony Porter was sentenced to death in 1983 for a double murder committed in Chicago in 1982. Porter's case reached the Illinois Supreme Court on direct appeal in 1986 and on postconviction review in 1995, but Porter was unsuccessful both times. A federal district court refused to grant Porter a writ of habeas corpus last year, and Porter now appeals that judgment. He asserts that he was denied his right to effective assistance of counsel and his right to an impartial jury at his state trial. After disposing of numerous procedural objections, we reach the merits of both claims. We conclude that neither an evidentiary hearing nor a writ of habeas corpus is warranted, and we therefore affirm the District Court's judgment.

## I. History

The facts of this case are recounted in detail in the Illinois Supreme Court's prior opinions and in Justice Marshall's dissent from the U.S. Supreme Court's denial of a writ of certiorari. *See Porter v. Illinois,* 479 U.S. 898, 107 S.Ct. 298, 93 L.Ed.2d 272 (1986) (Marshall, J., dissenting from denial of certiorari); *People v. Porter,* 164 Ill.2d 400, 207 Ill.Dec. 479, 647 N.E.2d 972 (1995); *People v. Porter,* 111 Ill.2d 386, 95 Ill.Dec. 465, 489 N.E.2d 1329 (1986). Rather than repeating those accounts in full, the following is a summary of the trial evidence and subsequent events most relevant to Porter's petition for habeas relief.

In the wee hours of August 15, 1982, Jerry Hilliard and Marilyn Green were shot and killed in Chicago's Washington Park. Two men who were drinking alcohol and swimming in a park pool that morning were the main witnesses to the events that transpired. One of the men, Henry Williams, got out of the pool around 1 a.m.; he was immediately robbed at gunpoint by Porter, whom both Williams and his fellow swimmer, William Taylor, knew from around the neighborhood. Porter fled, but while Williams was subsequently putting on his clothes, he saw Porter standing on bleachers near the pool and pointing a gun at Hilliard, who was sitting with Green on the bleachers. After getting his clothes on, Williams left the pool area but heard gunshots as he jumped over a fence.

Taylor meanwhile had continued to swim in the pool. When he got out, he too saw Porter pointing a gun at Hilliard, and Taylor actually saw Porter shoot Hilliard, who collapsed on the bleachers. (Taylor did not see Porter shoot Green, but blood matching

Green's was found in the bleacher area.) Porter then fled from the bleachers, carrying a gun and passing within three feet of Taylor. Taylor went up to the bleachers to Hilliard's body, and police arriving at the scene found Taylor standing there. Both Williams and Taylor later identified Porter in a mug book, and Taylor identified Porter in a lineup as well. On cross-examination, Taylor admitted that he originally did not tell the police that he saw Porter shoot Hilliard, but he claimed he did so only out of fear of Porter.

A police officer, who was responding to a call about the shooting, encountered Green shortly after she was shot. Green was running from the bleacher area, and she pointed to the south where the officer saw Porter running. The officer stopped and frisked Porter but found no weapons and released him. The officer filed no report of stopping Porter. The officer, however, testified that he informed the detective on the scene in Washington Park of the incident, and the officer also identified Porter in court. Green later died, and the police never found the murder weapon.

The defense presented three witnesses at trial, two of whom provided an alibi for Porter. The common-law wife of one of Porter's brothers testified that Porter was at his mother's house that night until 2:30 a.m., and a friend of Porter's testified that he and Porter drank together at the house and at a playground until 9 a.m. On cross-examination, however, the friend admitted that he had previously told police he had last seen Porter at 10:30 p.m.

On September 7, 1983, after deliberating for nine hours, a jury convicted Porter of armed robbery, unlawful restraint, unlawful use of a weapon, and both murders. After a two-phase death penalty hearing, the trial judge sentenced Porter to death for the murders and to thirty years for the armed robbery.[1] Before the judge dismissed the jury, however, it somehow came to the judge's attention that one of the jurors went to the same church as Green's mother. The judge brought the jury into court and asked that juror to identify himself or herself. One of the jurors, Lillie B. Trigleth, immediately stated, "Yes, but that didn't make any difference to me about that." The judge then asked Trigleth a few times if she was sure her acquaintance had not affected her judgment, and Trigleth denied that it had. Trigleth also claimed that she did not make the connection between the victim and the victim's mother until "after it had got started and everything was going on."[2]

The judge then dismissed the jury, stating that any further inquiry "would not have been proper, would have invaded the sanctity of the jury and jury deliberation." Defense counsel immediately moved for a mistrial, arguing that the judge should have questioned the juror in greater detail about her relationship with the victim's family. The judge denied the motion, but he allowed the defense to submit new motions in writing and scheduled a hearing for September 30, 1983. The defense filed a motion for a new trial and attached an affidavit from another juror stating that Trigleth had, upon entering the jury room for deliberations, "said as far as she was concerned, they could vote guilty right then." What happened regarding that motion, however, is not clear. The parties submitted to this court no evidence of a hearing on the motion, and after requesting the original trial record from the state court,

---

1. Porter waived his right to a jury at the death penalty hearing. It was the trial judge, therefore, who had to weigh the aggravating factors (such as Porter's prior felonies which included a robbery of a man sitting on the Washington Park bleachers in 1979) and the mitigating factors (such as Porter's church attendance and his five children) for sentencing purposes. Porter does not challenge the effectiveness of his counsel during the sentencing process.

2. It is not clear from the record exactly when Trigleth became aware that she knew the victim's

mother. During jury selection, the judge mentioned Marilyn Green as a victim and read a list of potential witnesses that included an "Opie Green" (possibly referring to Marilyn's mother, Ofra "Offie" Green). The judge never asked whether the prospective jurors knew any of the parties or witnesses. The judge did ask, however, whether the prospective jurors knew of any reason they would be biased for or against the State or the defendant, and the judge did allow defense counsel to submit additional questions. Ofra Green never testified at trial.

we were unable to find any transcript of the hearing. Porter did state, however, in his notice of appeal to the Illinois Supreme Court in 1983 that his motion for a new trial had been denied on September 30, 1983.

In a 4–3 decision, the Illinois Supreme Court upheld Porter's convictions and sentences on direct appeal. *People v. Porter,* 111 Ill.2d 386, 95 Ill.Dec. 465, 489 N.E.2d 1329 (1986). In that appeal, Porter argued that he deserved a new trial because the trial court had conducted an inadequate *voir dire* examination during jury selection and had failed to question Trigleth fully. The Illinois Supreme Court acknowledged that the trial court's "inquiry could have, and possibly should have, been more searching to determine the nature of the relationship" between Trigleth and Green's mother. *Id.,* 95 Ill.Dec. at 472, 489 N.E.2d at 1336. The court refused to grant a new trial, however, because Porter had failed to show Trigleth's bias. The court reasoned that Porter could have "subpoenaed the juror and others to testify at the hearing on his motion for a new trial," or he could have submitted an affidavit from Trigleth documenting her relationship with Green's mother. *Id.* The U.S. Supreme Court denied Porter's petition for certiorari, although Justices Marshall and Brennan dissented. *Porter v. Illinois,* 479 U.S. 898, 107 S.Ct. 298, 93 L.Ed.2d 272 (1986).

Porter sought state post-conviction relief on three grounds: 1) denial of an impartial jury, 2) ineffective assistance of trial counsel, and 3) ineffective assistance of appellate counsel. Porter introduced new evidence on the impartial jury issue, including the guest book at Green's funeral which showed that Trigleth was the second person to sign the book. Porter also introduced a 1990 sworn interview with Trigleth, in which she acknowledged that she attended Green's funeral and that she had once given a suit to Green's older brother.[3] Trigleth stated, however, that she had nothing to hide, that she had never known Marilyn Green personally and knew her mother only by her church membership, that she had given suits to

many children in the large congregation, and that she would attend any funeral "whenever ... somebody passed that belongs to the church." On the ineffective assistance of trial counsel claim, Porter argued that because his trial counsel was not paid in full, the lawyer failed to present significant alibi and exculpatory evidence. For example, Porter offered affidavits suggesting that Porter and Hilliard were members of the same gang and that another couple with Hilliard and Green in Washington Park that night was responsible for the murders.

The county circuit court denied Porter a new trial without an evidentiary hearing, and the Illinois Supreme Court affirmed unanimously. *People v. Porter,* 164 Ill.2d 400, 207 Ill.Dec. 479, 647 N.E.2d 972 (1995). The state high court refused to consider the impartial jury issue because its decision on direct appeal was *res judicata,* and the court rejected both of the ineffective assistance of counsel claims on the merits. *Id.,* 207 Ill. Dec. at 482–83, 647 N.E.2d at 975–76. Porter then sought federal habeas relief on a number of grounds, some of which were never raised in state court. The District Court denied all of Porter's claims, *Porter v. Warden, Pontiac Correctional Center,* No. 95 C 4111, 1996 WL 167340 (N.D.Ill. Apr.4, 1996), but issued a "certificate of probable cause" (CPC) to appeal on May 13, 1996. We remanded the case, however, for the limited purpose of determining whether a "certificate of appealability" (COA) should issue, as 28 U.S.C. § 2253 now requires. The District Court issued a COA but only for the impartial jury claim. *Porter v. Warden, Pontiac Correctional Center,* No. 95 C 4111, 1996 WL 465399 (N.D.Ill. Aug.9, 1996).

## II. ANALYSIS

### A. *Ineffective Assistance of Counsel*

Porter first argues that his trial counsel was ineffective and that an evidentiary hearing is necessary to prove the incompetence that his affidavits have suggested. The Sixth

---

**3.** This brother, Charles Green, testified briefly at trial regarding a broach of Marilyn Green's found near the site of the murders. (Trial Tr. at 712–16.) His name, however, was not on the list of potential witnesses read to the prospective jurors. His testimony, therefore, would be another logical point where Trigleth might have realized that she knew Marilyn Green's family.

Amendment, of course, guarantees an accused the right "to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, and it is well-settled that "the right to counsel is the right to the effective assistance of counsel," *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Moreover, the right to counsel applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 340, 83 S.Ct. 792, 794, 9 L.Ed.2d 799 (1963). Nonetheless, the State asserts that Porter may not assert this right here because he lacks a certificate of appealability for that issue.

Section 2253(c) of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), requires that a habeas petitioner have a certificate of appealability before taking an appeal to a court of appeals. On April 24, 1996, when this new section became law, Porter had neither the CPC required by previous law nor the COA required by the new law. The District Court's issuance of a CPC on May 13 was therefore not adequate for an appeal because the law then in effect required a COA. *See Herrera v. United States,* 96 F.3d 1010, 1012 (7th Cir.1996). We therefore remanded the case to the District Court to consider whether a COA should issue. The District Court carefully complied with § 2253(c) and specified that it was granting a certificate only with respect to Porter's impartial jury claim. Porter therefore has no COA with respect to his ineffective assistance of counsel claim, but he nonetheless raises that issue on appeal. The State argues that if Porter wanted us to consider his ineffective assistance of counsel claim he needed either 1) to ask the District Court to reconsider its ruling, or 2) to ask us separately for a COA *before* arguing the merits of his claim.

■ The State's position has a certain logic to it, but it is not the law. Federal Rule of Appellate Procedure 22(b) (also recently amended by the AEDPA) states that when a petitioner lacks a COA and yet "no express request for a certificate is filed," then a notice of appeal "shall be deemed to constitute a request addressed to the judges of the court of appeals." Our own circuit rules state the same. *See* 7th Cir. R. 22.1(b). So with respect to his ineffective assistance of counsel claim, Porter in effect asked us for a COA when he filed his notice of appeal. His current lack of a certificate is therefore not fatal to his claim, but we may reach the merits only after Porter jumps through one more hoop by making the "substantial showing of the denial of a constitutional right" that warrants a COA. *See* 28 U.S.C. § 2253(c)(2).

■ We have stated before that the new § 2253 does not make it substantively more difficult to get a COA than it was to get a CPC. *See Herrera,* 96 F.3d at 1012. A petitioner, in other words, must still demonstrate that an issue is debatable among jurists of reason or that the questions "deserve encouragement to proceed further." *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394 n. 4, 77 L.Ed.2d 1090 (1983). Moreover, "[i]n a capital case, the nature of the penalty is a proper consideration in determining whether to issue a certificate ... but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate." *Id.* at 893, 103 S.Ct. at 3394–95. Even a preliminary review of the history of this case and the affidavits Porter has submitted shows that his claim is not frivolous and presents a debatable issue, especially in light of the death sentence that hangs over Porter's head. We therefore issue the COA and move on to the merits of Porter's claim.

■ In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established that a claim of ineffective assistance of counsel will succeed only if a defendant shows 1) that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2068, and 2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. As to the first prong of that standard, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

*Id.* at 690, 104 S.Ct. at 2066. Ineffective assistance of counsel is a mixed question of law and fact, *id.* at 698, 104 S.Ct. at 2070, and our standard of review is therefore dictated by the recently-amended 28 U.S.C. § 2254(d)(1), *see Lindh v. Murphy,* 96 F.3d 856, 868–71 (7th Cir.1996) (en banc), *cert. granted in part,* —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997).[4] We may now grant habeas relief on such questions only if the state court judgment involved an "unreasonable application" of clearly established federal law, which means that "a responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." *Id.* at 871.

Although we have already stated that Porter's claim is debatable enough to justify a certificate of appealability, we have a much harder time saying that the "judgment in place is based on an error grave enough to be called 'unreasonable' " as *Lindh* requires. *Id.* at 870. The Illinois Supreme Court heard Porter's ineffective assistance of counsel claim on post-conviction review and carefully applied the *Strickland* standard. The court held that regardless of whether the counsel's performance passed the first prong of the *Strickland* inquiry, none of the alleged mistakes would cast enough doubt on the outcome to warrant a new trial. That conclusion appears to us to be a reasonable one.

Porter asserts that his counsel should have presented evidence that Alstory Simon and Inez Johnson were responsible for murdering Green and Hilliard. Porter has offered a number of affidavits and sworn statements by people in the neighborhood stating, among other things, that Simon and Johnson went to the park that night with Green and Hilliard, that Simon had just been released from the penitentiary and had a financial dispute with Hilliard regarding drug dealing, that Hilliard was seen arguing in the park that night with a man who was not Porter, and that Simon threatened someone who asked Johnson what had happened at the park. None of this evidence was offered at trial, although the State concedes that Simon and Johnson were in Washington Park with Hilliard and Green at some point on the night of the murders.

The affidavits and statements presented to us in the record, however, are often barely comprehensible, are often second- or even third-hand in nature, and are, at best, circumstantial evidence that is overwhelmed by the direct, eyewitness testimony offered at trial. Consider, for example, the affiant who claims Hilliard and Simon had a drug-related financial dispute. The affiant claims he overheard Simon say that Hilliard and Green were "taken care of." That statement, even if true, hardly precludes Porter from being the one who "took care" of Hilliard and Green. The affiant also states that Porter is innocent because "Inez Jackson" (presumably the affiant meant Inez *Johnson*) told a woman (who later told the affiant) that Simon committed the murders. How much credence can we reasonably give to such third-hand information when it contradicts two eyewitnesses and a police officer who put Porter right at the scene of the crime?[5] Moreover, the affiant does not help his credibility when he insists that an inmate friend of his, Walter Jackson (a.k.a. Butterball), can back up the affiant's story, but only if the affiant can "get word to him first" because otherwise Jackson will "play crazy and won't talk to you, or pretend he doesn't know what you are talking about."

---

4. *Lindh* held that § 2254(d)(1) applies to all pending habeas petitions. 96 F.3d at 867. Porter has respectfully noted his disagreement with that holding to preserve the issue in the event that the U.S. Supreme Court reverses *Lindh.*

5. Porter asserts that the police officer's testimony was "plainly" perjured because the officer testified that the prosecution never asked him to identify Porter in a lineup or mug book before the officer took the stand. Porter states that "[n]either the jury nor any court should believe that the prosecutor would put on a witness to make an in-court identification of the defendant without knowing whether or not the witness would identify the defendant." Appellant's Br. at 22. Such speculation is not enough to conclude that the officer was perjuring himself, especially in light of the fact that the jury convicted Porter even after observing the officer on the stand, after defense counsel cross-examined the officer on the identification issue, and after defense counsel again raised the issue in closing arguments.

One final point deserves mention before we leave the ineffective assistance of counsel claim. One of Porter's main contentions on both state and federal post-conviction review has been that "[b]ecause of defense counsel's refusal (due to financial reasons) to investigate the case, the jury was not told that [Porter] had known Jerry Hilliard for several years and that the two had belonged to the same gang." Appellant's Br. at 24. Porter argues that such evidence would have tended to show that Porter would not have killed Hilliard. We first note that we are hardly convinced that a member of an illegal street gang would never kill a fellow member. Street gangs and other criminal organizations survive by the violence that members can employ both against outsiders and against fellow members. The Illinois Supreme Court, meanwhile, found Porter's argument wanting for another good reason, namely that evidence of Porter's gang membership "would hardly have endeared [Porter] to the jury." 207 Ill.Dec. at 483, 647 N.E.2d at 976. Both of these rationales grant too much to Porter's argument, however, because what no one seems to have noticed is that Porter's counsel did present evidence that Porter and Hilliard belonged to the same gang. In his opening statement, Porter's counsel suggested to the jury that Porter was being set up by a rival gang to take the fall for murdering Hilliard:

> I believe that the evidence that comes into this courtroom will show you that Mr. Porter is a member of a gang. I believe that the evidence that comes into this courtroom will show you that the deceased, Mr. Hilliard, is a member of that same gang. I believe it is possible, but I'm not sure of this, that the evidence will show you that one or both of [the prosecution's eyewitnesses] were members of a rival gang.... [W]e believe that the evidence in a common sense fashion will show no reason for Mr. Porter, the defendant, to have committed these acts. (Trial Tr. 373–74.)

Defense counsel later tried—but was unable—to elicit testimony that the two eyewitnesses were members of a rival gang. The defense was successful, however, in showing that Porter and Hilliard were members of the same gang, as the direct examination of one of Porter's alibi witnesses shows:

Q: Now, Mr. Doyle, are you a member of any gang?

A: Yes, sir.

Q: What gang are you a member of?

A: Cobra Stone.

Q: Do you know the defendant Anthony Porter?

A: Yes I do.

* * *

Q: Is he a member of your gang?

A: Yes, sir.

* * *

Q: Did you know Jerry Hilliard?

A: Yes, sir.

Q: Did you know him very well?

A: Yes, sir.

Q: Was Mr. Hilliard a member of your gang?

A: Yes, sir.

(Trial Tr. 760–61.)

In short, Porter has not convinced us that the Illinois Supreme Court was unreasonable in denying his ineffective assistance of counsel claim. The Illinois Supreme Court applied the proper standard under *Strickland,* and the court reached a "responsible, thoughtful answer ... after a full opportunity to litigate," *Lindh,* 96 F.3d at 871. Moreover, an evidentiary hearing on this claim is unnecessary. Under the standard announced in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), a federal hearing is mandatory only when the habeas petitioner has alleged facts that, if proved, entitle the petitioner to relief.[6] *Id.* at 312, 83 S.Ct. at 756. Even if the allegations from Porter's affidavits withstood cross-examination at such a hearing, we do not think those second-hand accounts create a reasonable

---

**6.** As we discuss in Part II.B infra, § 2254(e)(2) of Title 28 now specifies circumstances under which federal courts may not grant evidentiary hearings to habeas petitioners. Nothing in the statute, however, suggests that *Townsend*'s requirements are no longer in force as a separate limit on the granting of evidentiary hearings.

probability that Porter would have been acquitted had they been heard at trial. The eyewitness and police testimony is simply too strong against Porter. We therefore deny Porter any relief on his ineffective assistance of counsel claim.

## B. *Impartial Jury*

Porter raises a stronger claim that he was denied an impartial jury at his state trial. The Sixth Amendment guarantees to a defendant a trial "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This right, moreover, binds the states through the Fourteenth Amendment's Due Process Clause. *See Duncan v. Louisiana,* 391 U.S. 145, 148–49, 88 S.Ct. 1444, 1446–47, 20 L.Ed.2d 491 (1968); *Parker v. Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966). On this appeal, Porter specifically argues that a federal evidentiary hearing is necessary to resolve his claim because the Illinois courts never held a full and fair hearing regarding Trigleth's participation on the jury.[7] Before we can reach the merits of Porter's claim, however, we must deal with three potential procedural obstacles.

First, we must again confront the certificate of appealability issue. The District Court did grant Porter a certificate of appealability on his impartial jury claim, but 28 U.S.C. § 2253(c)(1)(A) requires a certificate issued by "a circuit justice or judge" for a habeas petitioner to appeal. If that language means that only a circuit justice or circuit judge may issue a certificate, Porter does not have a properly-issued COA. Such a reading, however, contradicts Federal Rule of Appellate Procedure 22(b), which was enacted by Congress contemporaneously with § 2253(c). Rule 22(b) forbids habeas appeals "unless a district or a circuit judge issues a certificate of appealability pursuant to section 2253(c)." Other circuits have harmonized the two provisions by interpreting § 2253(c) to allow a circuit justice or any federal judge—circuit or district-to issue cer-

tificates of appealability. *See, e.g., Else v. Johnson,* 104 F.3d 82, 83 (5th Cir.1997); *Hunter v. United States,* 101 F.3d 1565, 1573–83 (11th Cir.1996). We need not decide that issue today, however, because we think Porter has easily satisfied the requirements for a COA, and we thus issue our own certificate as well. So regardless of whether a district judge may issue the certificates or whether only a circuit judge may, Porter's appeal can go forward because he now has a certificate from each.

Second, the State argues that Porter procedurally defaulted his claim by failing to raise it in state court. On both direct appeal and state postconviction review, Porter asserted that he deserved a new trial based on Trigleth's participation on the jury. The State argues, however, that Porter never complained *specifically* about the trial judge not allowing a full hearing regarding Trigleth's bias. The State says the issue "was never raised in any fashion in the state courts." Appellee's Br. at 23. Even if the State is correct to parse Porter's claim so finely, the State is factually wrong that Porter never raised this specific issue in state court. In his brief to the Illinois Supreme Court on direct appeal, Porter argued, "The trial court improperly denied defendant's motion for new trial ... where the trial court failed to inquire in depth as to the existence of bias or prejudice of a juror after verdict." A habeas petitioner must only "fairly alert" the state court of the federal constitutional grounds for his claim, *see Bocian v. Godinez,* 101 F.3d 465, 469 (7th Cir.1996), and we have stated that "[w]hat is important is that the *substance* of the federal claim be presented fairly," *Verdin v. O'Leary,* 972 F.2d 1467, 1474 (7th Cir.1992). Porter's state court brief clearly met those standards.

■ The third procedural obstacle is the Illinois Supreme Court's refusal to address the issue of Trigleth's jury participation on state postconviction review. The court refused to address the issue because the court's resolution of the issue on direct appeal was *res judicata.* 207 Ill.Dec. at 483–84, 647

---

7. Porter argued to the Illinois Supreme Court and to the District Court that the trial court's voir dire examination during jury selection was constitutionally inadequate. He does not raise that argument in his appellate brief, and we therefore consider it waived.

N.E.2d at 976–77. The State asserts that this *res judicata* bar is the type of state procedural rule that, under *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), also prohibits federal review. The State is mistaken because a habeas claim cannot possibly be kept out of federal court merely because state *res judicata* rules bar rehearing in state court. *See Gomez v. Acevedo*, 106 F.3d 192, 196 (7th Cir.1997); *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir.1996). When a state court invokes *res judicata*, it simply means that the state courts have already resolved the matter and want nothing more to do with it. If state courts could, by simply shutting their ears to litigants, preclude further review in the federal courts, few habeas petitioners (if any) would ever make it to federal court. As we stated in *Hogan*, the crucial inquiry is

> whether the state courts either have held that a procedural misstep is a forfeiture, or would so hold if a collateral attack were filed in state court. If the prisoner has presented his argument to the right courts at the right times—as the states define these courts and times—then the claim is preserved for federal collateral review.

*Hogan*, 74 F.3d at 147.

Although the Illinois Supreme Court's invocation of *res judicata* is therefore not enough to keep Porter's claim out of federal court, the Illinois court went on to consider whether new evidence (i.e., Trigleth's sworn interview) entitled Porter to reopen the juror bias issue. 207 Ill.Dec. at 483, 647 N.E.2d at 976. Based its earlier ruling on direct appeal that Porter could have either subpoenaed Trigleth or submitted an affidavit from her at the hearing on Porter's motion for a new trial, *see* 95 Ill.Dec. at 472, 489 N.E.2d at 1336, the Illinois Supreme Court held on postconviction review that "the time for presenting that evidence was during the post-trial hearing" and therefore refused to consider Porter's new evidence. 207 Ill.Dec. at 483, 647 N.E.2d at 976. Regarding the new evidence, in other words, the Illinois Supreme Court invoked a forfeiture rationale which, in contrast to a *res judicata* rationale, normally does preclude federal review. As mentioned above, however, the record does not reveal whether Porter ever got a hearing on his motion for a new trial. Because we are unsure about what transpired regarding this motion (other than knowing that it was denied) and because Porter plausibly argues that he could not subpoena Trigleth or get an affidavit from her because the trial judge wanted to protect her from questioning, we will assume that Porter had no reasonable opportunity to present his evidence to the trial court and that no procedural bar therefore blocks our consideration of the evidence.

■ With these procedural roadblocks finally out of the way, we can move on to the merits of Porter's claim. Lillie Trigleth's participation on the jury that convicted Porter is undoubtedly in tension with the rule of law, which enshrines impartiality as a *sine qua non* for fair and just legal outcomes. As the U.S. Supreme Court has stated, due process of law requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). We agree with the Illinois Supreme Court that the trial court's inquiry into juror bias in this case "could have, and possibly should have, been more searching." 95 Ill.Dec. at 472, 489 N.E.2d at 1336. Thirteen years later, however, the question for us is whether doubts regarding Porter's jury are so severe as to imperil the legitimacy of Porter's conviction.

Jury bias during a state court trial is a question of fact that state courts are "in a far better position than the federal courts to answer." *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983). And under either pre- or post-AEDPA law, state court determinations of factual issues are presumed to be correct on federal habeas review. Compare 28 U.S.C. § 2254(e)(1) (1997) *with* 28 U.S.C. § 2254(d) (1994). The state courts here found no juror bias, but we cannot blindly apply the presumption of correctness to this finding because, as noted above, we are assuming for the sake of our discussion that the trial court never conducted an adequate hearing. Un-

der pre-AEDPA law, the presumption of correctness would clearly not apply because "the material facts were not adequately developed at the State court hearing," 28 U.S.C. § 2254(d)(3) (1994).

The new § 2254, however, drops that language and, more significantly, curtails the availability of evidentiary hearings to develop material facts. *See* 28 U.S.C. § 2254(e)(2). Indeed, the language of the new law raises a substantial question of whether we even have the power to grant an evidentiary hearing to someone in Porter's position.[8] Porter may therefore face a much more difficult burden under post-AEDPA law as compared with pre-AEDPA law. We find, however, that Porter is not entitled to a hearing even under pre-AEDPA law. In other words, even if we strip the state court finding of any presumption of correctness, and even if we ignore the new law pertaining to evidentiary hearings, we still find that Porter's petition warrants no relief.

Under *Townsend and Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), a federal evidentiary hearing is required if a habeas petitioner alleges facts which, if proved, would entitle him to relief and the state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing. *See Townsend,* 372 U.S. at 312, 83 S.Ct. at 756; *Tamayo–Reyes,* 504 U.S. at 11, 112 S.Ct. at 1721. Moreover, when a question of juror partiality is raised, a determination on that question "may properly be made," *Phillips,* 455 U.S. at 217, 102 S.Ct. at 946, at a post-trial hearing "with all interested parties permitted to participate," *Remmer v. United States,* 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). Such a hearing gives a defendant "the opportunity to prove actual bias." *Phillips,* 455 U.S. at 215, 102 S.Ct. at 945.

As we stated recently, however, the *Townsend* requirement of a hearing "cannot be taken literally, since we know that the district court 'may employ a variety of measures in an effort to avoid the need for an evidentiary hearing' on disputed facts." *Bracy v. Gramley,* 81 F.3d 684, 693 (7th Cir.1996) (quoting *Blackledge v. Allison,* 431 U.S. 63, 81, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977)), *cert. granted in part,* — U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997). The

---

**8.** Section § 2254(e)(2) states that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," a federal court may not conduct an evidentiary hearing unless the applicant shows both 1) that the claim relies on either new law or new facts that the applicant could not reasonably have used in the state court proceedings, *and* 2) that the "facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Assuming that Porter satisfies the first requirement because the state court refused to give him an adequate hearing, he still cannot satisfy the second requirement because his jury bias allegations do not lessen the ample evidence of his guilt.

One might question, however, whether this whole provision even applies to Porter. The statute prohibits evidentiary hearings only where "the applicant has failed to develop the factual basis" of his claim. "Failed to develop" could mean that the applicant must be at fault in some way for not developing the facts, or it could mean that, for whatever reason, factual development just never happened. Under the first reading, Porter might be allowed a hearing because his attorney *tried* to get the state court to investigate further. The statute would therefore not

apply (and Porter would get a hearing) because it was the state, not the applicant, who failed to develop the facts. Several district courts have interpreted § 2254(e)(2) this way. *See, e.g., Caro v. Vasquez,* No. C93–4159 JW, 1996 WL 478683, at *5 (N.D.Cal. Aug.19, 1996).

Under the second reading, however, it would not matter that Porter tried his best to develop the facts. Porter would not get a hearing because federal evidentiary hearings would be limited (by the second prong of § 2254(e)(2)) to those important cases where an applicant's actual innocence was strongly suggested. Indeed, one district court in this circuit has adopted this interpretation of § 2254(e)(2). *See Burris v. Parke,* 948 F.Supp. 1310, 1324–26 (N.D.Ind. 1996). This reading may seem harsh to applicants who, through no fault of their own, are denied hearings by state courts. Remember, however, that the new statute is indisputably going to deny evidentiary hearings to many applicants who have litigated diligently. If, for example, the facts underlying a constitutional claim come to light only after state court proceedings, a petitioner will still not get an evidentiary hearing if the facts would not establish the petitioner's innocence by clear and convincing evidence. In other words, if many diligent applicants are going to lose out under this statute, why should Porter not be one of them? As stated above, we need not decide this question today.

Supreme Court noted in *Blackledge*, for example, that a district court may order discovery or direct that the record be expanded to avoid "the time and expense required for an evidentiary hearing." 431 U.S. at 82, 97 S.Ct. at 1633 (quoting Advisory Committee Note to Rule 7, Rules Governing Section 2254 Cases in the United States District Courts). Indeed, Rule 7 contemplates "letters, documents, exhibits, and affidavits" being added to the record, potentially obviating the need for an evidentiary hearing.

The relevant question on habeas review, therefore, is not so much whether a petitioner has had all the trappings of a full evidentiary hearing, but rather whether the petitioner received "careful consideration and plenary processing of [his claim,] including full opportunity for presentation of the relevant facts." *Blackledge*, 431 U.S. at 82–83, 97 S.Ct. at 1633 (quoting *Harris v. Nelson*, 394 U.S. 286, 298, 89 S.Ct. 1082, 1090, 22 L.Ed.2d 281 (1969)); *see also Jeter v. Keohane*, 739 F.2d 257, 257 n. 1 (7th Cir.1984) ("An evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issue are already before the court."). We think that even though Porter may never have had an official evidentiary hearing, he has had a full opportunity for the presentation of his claim. Porter's current counsel interviewed Trigleth under oath in 1990, and Porter submitted a transcript of that interview to the state courts on postconviction review. The transcript was similarly before the District Court, and we have attached the interview as an appendix to this opinion. Our reading of that interview shows that Trigleth has been asked all of the relevant questions regarding her bias and that she, as stated in her own words, has "nothing to hide." At the time of the interview, Trigleth was 75 years old and still working as a nurse. Even before being confronted with the guest book from the funeral (which showed her signature), Trigleth admitted quite frankly that she had attended Green's funeral. She added, however, that she attended the funeral whenever any member of her large congregation died. Trigleth stated that she knew Green's mother only through membership in the church, that she had never been over to Green's mother's house, and that Green had not attended the church since childhood. Trigleth also stated that she could not quite remember when it dawned on her that she knew Green's mother, but that it "was almost to the end" of the trial. Finally, Trigleth forthrightly admitted telling her fellow jurors that she knew Green's mother.

Such attenuated connections between Green and Trigleth do not suffice to prove actual bias. We can draw no conclusion from this record other than that the elderly Trigleth didn't actually know, in the usual sense, either Marilyn Green or her mother. Their only connection was membership in a huge congregation which at one point had up to 3,000 members. When put in this context, Trigleth's attendance at Green's funeral and her gift of a suit to Green's brother suggest Trigleth was merely a duty-bound parishioner, not a covert vigilante out for revenge against Green's murderer.[9] The record supports no conclusion other than that Trigleth went to Marilyn Green's funeral because she made a habit of attending funerals of anyone who had a connection with the church. She didn't go to this particular funeral for any other reason. And because her acquaintance with the Greens was so attenuated, her failure to recognize Marilyn Green's name on *voir dire* is understandable and meaningless. The state courts were convinced, and on this record, so are we, that Ms. Trigleth was free of prejudice when she was one of the twelve jurors who sat in judgment on Porter's fate. Moreover, we would note that the jury found Porter guilty of murdering Hilliard too, and

9. Our conclusion admittedly is based mostly on Trigleth's own statements. As the U.S. Supreme Court noted in *Phillips*, however, juror bias determinations "will frequently turn upon testimony of the juror in question, but ... such evidence is [not] inherently suspect." 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7. The Court went on to say that "[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.* (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)).

no one has suggested that any juror was biased regarding Hilliard.

Porter's fallback argument, however, is that the sworn interview with Trigleth still did not give him an adequate opportunity to show Trigleth's bias. He argues that Trigleth appeared for the interview voluntarily and that counsel could therefore not ask tough questions for fear that Trigleth might leave. Without the threatening power of a subpoena hanging overhead, in other words, Porter's counsel supposedly could not conduct a meaningful interview. Porter is obviously grasping for straws because the transcript of the interview belies this argument. Porter not only fails to point out any question that Trigleth refused to answer, he also fails even to show where Trigleth might have been evasive in her answers. In fact, counsel stated to Trigleth at the interview, "[Y]ou have been pretty agreeable talking to me and answering my questions." Trigleth admittedly could have walked out of the interview at any time, but counsel's questions do not appear to have come close to making Trigleth leave. Moreover, if all Porter needed was a court order to ask Trigleth a few more hardball questions, a court-sanctioned deposition would have been the perfect place to do it. Porter, however, never asked the District Court to authorize such discovery, which Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts clearly permits.

Porter has had an opportunity to prove actual bias, but he has failed to do so. He has thoroughly interviewed Trigleth under oath, but her answers show that the allegations of bias have only surface appeal but no substance. A further evidentiary hearing would be little more than the proverbial fishing expedition. We therefore grant Porter a certificate of appealability regarding both of his claims but deny Porter any relief on the merits. The District Court's judgment is AFFIRMED.

## APPENDIX

STATE OF ILLINOIS

COUNTY OF COOK

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT—CRIMINAL DIVISION

ANTHONY PORTER,

Petitioner,

vs.

PEOPLE OF THE STATE OF ILLINOIS,

Respondent.

P.C. No. 4823

The sworn statement of LILLIE B. TRIGLETH, taken before KIMBERLY D. BURES, a Notary Public within and for the County of Will, State of Illinois, and a Certified Shorthand Reporter of the State of Illinois, at Suite 1315, 53 West Jackson Boulevard, Chicago, Illinois, on the 27th day of March, 1990, at 12:30 p.m.

PRESENT:

LAW OFFICE OF KENNETH N. FLAXMAN, (53 West Jackson Boulevard, Suite 1315, Chicago, Illinois 60604), by: MR. KENNETH N. FLAXMAN,

appeared on behalf of the petitioner.

REPORTED BY: KIMBERLY D. BURES, C.S.R.

INDEX

| WITNESS | EXAMINATION |
|---|---|
| LILLIE B. TRIGLETH | |
| by Mr. Flaxman | 4 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Trigleth Deposition Exhibit | |
| No. 1 | 11 |

(WHEREUPON, the witness was duly sworn.)

LILLIE B. TRIGLETH,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

## EXAMINATION

BY MR. FLAXMAN:

Q. The first question that lawyers always ask people is: Would you state your name and spell your last name please.

A. Lillie B. Trigleth, T-r-i-g-l-e-t-h.

And where do you live, Ms. Trigleth?

A. 2120 South Trumbull Avenue.

Q. And how old are you?

A. 75.

Q. You don't look 75.

A. Thank you. I still work.

Q. What kind of work do you do?

A. I nurse.

Q. How long have you been doing that?

A. Ever since '67.

Q. You look great.

A. I keep active waiting on sick people.

Q. Where do you work?

A. At 2626 Lakeview.

Q. What's there?

A. Miss Archie: Charlotte Archie's. Had a hip replaced.

Q. You work for like one person?

A. Yes. Well, whatever, you know.

Back in 1982, I guess, you got—

A. '82.

I think it was '82 you got called to be a juror.

A. It's been so long.

Q. The exact date isn't too important. Had you ever been on a jury before?

A. Yes.

Q. How many times were you on a jury?

A. About three times. I got one of the slips I saved. I didn't know what the year was.

Q. Can I see what you have got?

A. Checked in my file box, in my file, and found one slip. This one was '84. It was on just jury duty.

(WHEREUPON, the document was tendered to counsel.)

BY MR. FLAXMAN:

Q. Did you sit on a jury back in 1984?

A. Yes. I was—

Q. In a criminal case too?

A. No; no. That's the first criminal case I was on.

Q. The one with Mr. Porter?

A. Right; right.

Q. After the jury had reached its decision, you came back into court and the judge asked you some questions. Do you remember that?

A. Yes.

Q. In the transcript he said that one of the jurors stated that he knew that some other juror purportedly or allegedly went to the same church as one of the decedents' mothers, and then you raised your hand, I guess.

A. Yes, because I didn't know I didn't know what trial it was until it come to you know, and I do know the girl's mother because we did go to the same church.

Q. How well did you know the girl's mother?

A. Well, I know her by membership. That's all.

Q. Did you know the girl?

A. No, I didn't know her.

Q. How big a church is it?

A. A big church. About—oh, sometimes we have about 1,000.

Q. 1,000?

A. Or 3,000 once, we had, but you know how they come and go; big church.

Q. Do you go every Sunday?

A. Yes.

Q. How many people do they have on Sunday?

A. Sometimes 500 now. It fell off a lot.

Q. After the trial did anybody come talk to you about this until Mr. Ridley did like a couple years ago?

A. Oh, yes, this fellow here, Mr. Riley.

Q. Mr. Ridley. He works for me. He came—

A. He came to my house.

Q. But before he came to your house, did anybody who said they were working for a lawyer or a lawyer—

A. No; no, they didn't.

Q. Do you remember whether or not you went to the funeral for Marilyn Lee Green?

A. Did I go to the funeral?

Q. Yes; yes.

Q. Yes, I went to the funeral.

Q. How big a funeral was it?

A. The family, the church members; not to big.

Q. Was it one of the funerals where the casket was open?

A. Yes, it was open.

Q. Did they make her look okay?

A. Yes.

Q. Had you known her when she was a little girl?

A. Well, yes, but when she growed up, she didn't belong to our church, but the mother did. Yes, I knowed her when she was a little girl.

Q. Her mother used to bring her to the church?

A. Yes.

Q. Did you ever—what kind of things did you do at the church?

A. Who?

Q. You. Did you ever do anything with children at the church?

A. Yes. I teach; school teacher, Sunday school teacher.

Q. How long have you been doing that?

A. About 15 or 20 years, something like that.

Q. What kind of things do you teach?

A. Sunday school.

Q. How old of children do you teach?

A. They're about 10, 15, like that.

Q. How big a class?

A. Sometimes be 20.

Q. They still come when they're 15?

A. Yeah; yeah, you know how they do.

Q. I have an 11 year old who thinks he's old enough to not to—the girl that was killed, was she one of your Sunday school students?

A. No, she wasn't. She wasn't in my class.

Q. Do you know the boy who was killed?

A. No.

Q. What else did you do at the church?

A. What else do I do? I'm a missionary. I go to visit the sick and help people out and that.

Q. When did you realize in the trial that you knew the mother of the girl who was killed?

A. That was almost to the end, when the name was mentioned, and I said, "Oh, I know the mother," you know. "She belongs to my church," and that was it. They never asked me, you know, did I know, but I didn't know what I was getting into, but later on they didn't ask me, you know, did I know the family or whatever.

Q. Didn't they read a list of names in the beginning and say, "Do you know any of these people?"

A. No. The jury didn't do that.

Q. Were there pictures at the trial, where they showed you pictures?

A. Yes, they showed the pictures, sure.

Q. When you looked at the pictures, did—

A. But I didn't know her, you know, because she got grown up. She didn't come to our church, just the mother.

Q. How often do you go the funerals from the church?

A. Whenever, you know, somebody passed that belongs to the church.

Q. Now, you have been pretty agreeable talking to me and answering my questions.

If back after the trial, which, I think, was 1982—

A. Probably forgot the year.

Q. I think it was '82. If somebody came to you and said—do you remember the lawyers who represented Porter?

A. You said do I remember the lawyers?

Q. Yes. Mr. Gursel.

A. No, I don't remember.

Q. If one of those lawyers had come to you after the trial, would you have told him the same stuff you told me?

A. Sure. I have nothing to hide.

Q. Now, I have the book, the book from the funeral, which I will show you and which we will mark as Exhibit 1.

(WHEREUPON, said document was marked Trigleth Deposition Exhibit No. 1, for identification, as of 3/27/90.) (WHEREUPON, the document was tendered to the witness.)

BY MR. FLAXMAN:

Q. The thing that I thought was interesting is that—well—

A. Found my name right here.

Q. You are the second name there?

A. My name, yes.

Q. Does that mean you got there early, that you signed second?

A. Well, I guess so, because—I think it was during the week, wasn't it? I don't know.

Q. I think it was on Friday.

A. Yes; yes, on a Friday.

Q. Were you working then?

A. Well, if I was, I got off from work, you know.

Q. Do you know who Georgia West is?

A. Georgia West?

Q. Yes.

A. No.

Q. That's the name on top of yours on this.

A. "Georgia West, 5537 South Aberdeen." That's probably some of Miss Green's people.

Q. I'm trying to figure out if you went to the funeral with anyone.

A. Did I go with anyone?

Q. Yes.

A. I went myself. I drive myself. I drive, and I don't have to—

Q. Did Miss Green work at Sears or have friends at Sears? Do you know anything about that?

A. No, I don't know anything about that.

Q. A lot of these names have the names and have "Sears" after it.

A. Maybe some friends or something. I don't know.

Q. How did you happen to tell—how did it come up that you told somebody that you knew the victim's mother, you knew Marilyn's mother?

A. Well, when we was discussing—and I mean, I was excited. I didn't know, you know, that that was it, you know, her daughter's funeral. I said, "Oh, I know the girl's mother. She go to our church." That's what I say.

Q. How did that come up?

A. I don't know. I was excited as I said that, you know.

Q. What were you excited about?

A. The trial that—I had heard about what happened, and she was one of them. That's what I said. I said, "Oh," I says, "She belongs to our church. The girl's mother belongs to our church, Ofra Green."

Q. That's Marilyn Green's mother?

A. Yes, Ofra, whatever.

Q. Had you heard about—

A. I heard it already.

Q. Before the trial?

A. Through her belongs to our church she was saying about her daughter, you know. Through the news.

Q. Had you ever heard of Tony Porter before the trial?

A. No; no.

Q. Did any jurors say anything when you were excited and you said that you knew Ofra Green?

A. I think one of the ladies did say, "You do?" you know, like that, so that was it.

Q. That came up right at the beginning, when you started?

A. No; no. That was—I think we was there for—how many days?

Q. Three or four days?

A. Yes, something of that nature, and then when I discovered it, I said, "Oh, she belongs to our church. I know the girl's mother," so that was it.

Q. Did you ever go to the mother's house, to Ofra Green's house?

A. No.

Q. Did she ever come to your house?

A. No. We never—

Q. She was never in your Sunday school class?

A. No.

Q. Any of her other children in your Sunday school class?

A. Any of her children?

Q. Yes.

A. Let me see. Ofra had about 15; 10, 15, something like that.

Q. She had 10 or 15 children?

A. Yes, all together. You know, she keep her grandkids. I can't remember. Yes; yes, one of her sons, Charles, was in my class, Charles Green.

Q. How was it that Marilyn Green never got into your class?

A. I don't know. I really don't. I didn't know her, you know. She had so many, but Charles, I know him well, her brother.

Q. Whose brother?

A. Marilyn's brother.

Q. He is the one who was in your Sunday school class?

A. Yes.

Q. How well did you know him?

A. I knowed him well. Grew up there.

Q. Who grew up there?

A. Charles Green.

Q. How old—

A. Her brother.

Q. How hold is he?

A. I guess Charles in his 30s now. I don't know exactly. I imagine he's in his 30s, maybe—let me see—35.

Q. He was older than Marilyn?

A. Yeah, he was older than Marilyn. I remember he got up and he spoke at church that the first suit he wore, I give it to him. the first suit of clothes that he wore, I gave it to him, so he got up and stated it in church one time.

Q. Do you do that for a lot of kids?

A. What?

Q. Have you done that for a lot of kids?

A. Oh, yes.

Q. Where do you get the clothes from?

A. For different ones give me clothes, and I give them to the kids, pick them up, take them to Sunday school, dress them up.

Q. Sounds like a nice thing to do.

A. It is.

Q. But you never did Marilyn Green? Any other names that you know on this, on this—

A. Lelu Fowler, Miss Fowler here. Let me see. The members of our church, yes, I know. Let me start back now. Jeanette Smith, yes, I know Jeanette, and Evangelist Morgan. Let me see. There's a lot of her friends. Yes, Mr. and Mrs. Sam Waller and family, I know those people; Mrs. Thirston, I know her; Lillie Thompson, I know her; Ruthie Mae Jones, I know her; Ella B. Cullins, I know her; Kara Wesson, I know her; and Clara Wesson I know her; Maggie Webb, I know her; Willie Mae Brown, I know her; and Miss Bradley, I know her. That I remember. Lelu Fowler, I guess you got that; Reverend and Mrs. Randall.

Q. Anybody else?

A. Wilma Cooper, yes. Those are the members. Mary Crosby, I know her.

Q. Looks like—

A. Ora Carter, I know her; Bobbie Thurman, I know her; Mrs. Davis, I know her. These are the members of our church.

Q. Are these active members of the church?

A. Oh, yes.

Q. So you're pretty active in the church?

A. Yes.

Q. How long have you been going to that church.

A. Let me see. About 23 years.

Christine Stevenson, I know her; Thelma Williams, I know her; Sam and Esther, Sam and Esther Waller; Willie Mae Hampton, I know her. This is the Reverend C—is that Charles? Is this Charles here?

Q. Looks like Reverend Charles A. Green.

A. Now, that's her brother. That's the one that was raised up in the church here. That's what I thought.

Q. He's Marilyn's brother?

A. He's Marilyn's brother.

Q. Is he a reverend at your church or a different church?

A. Pardon? He was. I mean, he grew up there, and he started preaching after he, you know, growed up there, but he doesn't come anymore.

Let's see. Who else? Kate—Kate—Ruby Ward. That's about all. That's it. That's about it.

Q. Do you remember at the beginning of the trial whether the judge read off the name of all the witnesses who were going to testify?

A. I don't remember that. I really don't.

Q. When was it that you first realized that you knew Marilyn's mother?

A. Let me see. To tell the truth, I guess about the third day, I think it was.

Q. Was there any particular—anything happen that made you know who—

A. When they said about—they brought the pictures, and then they showed the pictures around, then I was, "Oh," like that, you know, I guess, about the third day.

Q. So you recognized her when you saw the picture?

A. No; no, I didn't recognize her, but they said about the Green family, and it came to me that this girl's mother was a member of our church, and that's when I spoke and said—

Q. Did they—

A. —to the panel.

Q. Was that—

A. Just sitting around.

Q. At lunch?

A. No; no. We was sitting around the table when we—

Q. That was after the trial was over and you were deciding on guilt or innocence?

A. No. That was just—

Q. Before that?

A. When we was talking. See, we was in our room, and I told the panel, I said, "Oh, she was a member. This girl's mother was a member of our church." That's what I said.

Q. Then there was like another day or so of trial?

A. Yes. I think it went three days or something like that. I don't know.

Q. But it was after they showed the pictures that you knew, that you—

A. No, no, no. I mean I didn't recognize the pictures or nothing because after she got grown up, she didn't come to church anymore. She didn't come to church.

Q. So what was it that made you know that you knew her?

A. When they called her name, her mother's name, Ofra Green. When they called her name, I said, "Oh, she belonged to our church," like that, when they called her name.

Q. Did Ofra Green—

A. Her mother.

Q. How did her name come up?

A. I really don't know exactly. It's been so long. It's been so long since then I don't know how it came up. I know it struck me when I was on this trial, her daughter. I don't know how it came up.

Q. Is there anything else that you thought about, about this trial, that I haven't asked you or that has bothered you or anything like that?

A. No. We just discussed it and left it up to the judge after. They would see us to the car and see us safe to the cars, and that was it.

Q. I don't understand.

A. I said after—when you get through they see us safe to the car, and the next day we would come back, and that was up to the judge to decide what would be, you know.

Q. Right. Okay. I want to thank you very much for coming.

A. Okay.

MR. FLAXMAN: And we are done.

STATEMENT CONCLUDED.

STATE OF ILLINOIS

COUNTY OF WILL

I, KIMBERLY D. BURES, a Notary Public within and for the County of Will, State of Illinois, and a Certified Shorthand Reporter of said State, do hereby certify that I reported in shorthand the sworn statement of LILLIE B. TRIGLETH, and that the foregoing is a true, complete, and correct transcript of said sworn statement as appears from my stenographic notes so taken and transcribed under my personal direction.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 2nd day of April, 1990.

Kimberly D. Bures

Notary Public, Will County, Illinois.

My commission expires May 9, 1993.

C.S.R. Certificate No. 84–3292.