In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2354

PATRICIA OUSKA,

Petitioner-Appellant,

v.

LYNN CAHILL-MASCHING,/1

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 3363--William T. Hart, Judge.

Argued September 26, 2000--Decided April 12, 2001

Before COFFEY, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.  Patricia Ouska was
charged with the armed robbery and murder of
Beeland Te on May 7, 1992, and was tried before
an Illinois jury. Ms. Ouska was found guilty of
those charges and was sentenced to life
imprisonment without parole by the trial court.
The Appellate Court of Illinois affirmed Ms.
Ouska's conviction, and the Illinois Supreme
Court denied her leave to appeal. Ms. Ouska then
filed a petition for a writ of habeas corpus in
the district court; she asserted that, during her
trial, the prosecution (1) used her pre-arrest
silence as substantive evidence of her guilt in
violation of the Fifth Amendment and (2) used her
post-arrest silence against her in violation of
the Due Process Clause of the Fourteenth
Amendment. She also claimed that her trial
counsel's failure to object to these violations
deprived her of the effective assistance of
counsel guaranteed by the Sixth Amendment. The
district court denied Ms. Ouska's petition in its
entirety. For the reasons set forth in the
following opinion, we affirm the judgment of the
district court.
I
BACKGROUND
A.  Facts

On May 7, 1992, between 9:00 and 10:00 a.m.,
Beeland "Rosa" Te was stabbed to death in the

convenience store that she ran on West 18th Street in Chicago. Te sold a number of different items in the store, including toys, candy and lottery tickets. In order to help her customers more easily fill out their lottery slips, Te kept a number of small pencils available in the store for that purpose. She also kept a medal of Saint Benedict in her cash register, a gift from her sister that had been purchased in the Philippines. Te had experienced health problems in the past, and, due to a double mastectomy, she wore silicone gel implants in her prosthesis.

Ms. Ouska and her twenty-two-month-old child lived with Ms. Ouska's former foster mother, Ruby Fontenot, only a two or three minute walk from Te's store. Fontenot, who knew Te and often stopped in her store, testified that she discovered that Ms. Ouska had borrowed money from Te and had not yet repaid that loan. Fontenot prodded Ms. Ouska to find the money to repay this debt, and on the morning of the murder Ms. Ouska left Fontenot's home between 9:15 and 9:20 a.m. with her daughter in order to obtain those funds.

At some point before 10:00 a.m. that morning, Ms. Ouska rang the doorbell of Erma Gonzalez, who lives approximately two blocks away from the Fontenot home. Ms. Ouska was bleeding from her leg and told Gonzalez that a Mexican man had tried to rob her on the street and had stabbed her with a screwdriver. Gonzalez refused Ms. Ouska's request to allow her to clean her wound in Gonzalez's apartment, and so Ms. Ouska returned to the Fontenot home. When she arrived there, she encountered Patricia Rutledge, a babysitter working for Fontenot that morning. Rutledge noticed that Ms. Ouska kept her right hand in her pocket and that her leg was cut. While Ms. Ouska went to her room, Rutledge dialed 911, and paramedics soon arrived to take Ms. Ouska to the hospital.

At about the same time that morning, Te's body was discovered at her store; she had been stabbed forty-two times and had eight superficial cutting wounds. The cash register was open and contained no money. Additionally, there were no signs of forced entry to the door separating the customer area of the store from the store's rear portion, where Te's body was found./2 Te normally kept that door closed and locked. In that rear portion of the store was a bathroom, where investigators found a bloody rag in the sink.

Later that afternoon, Fontenot and her daughter Vickie found two blood-stained one-dollar bills on Ms. Ouska's dresser, along with a printout of winning lottery numbers from a previous date. The next morning, on May 8, 1992, while Ms. Ouska was

still at Illinois Masonic Medical Center recovering from her stab wound, Rutledge was again babysitting Fontenot's grandchildren and Ms. Ouska's daughter at the Fontenot home. Suspicious about the events of the previous day, Rutledge entered Ms. Ouska's room and looked under her mattress, where she found a bloody knife. Fontenot later testified that she recognized that knife as one that Ms. Ouska had shown her while the two were in Ms. Ouska's room only a few weeks before.

During that same morning, Ms. Ouska made repeated phone calls from the hospital to a neighbor, Lenoir Sanchez. Ms. Ouska ultimately asked Sanchez to get something for her from under Ms. Ouska's mattress in the Fontenot home, which was located next door to Sanchez's apartment. Sanchez testified that Ms. Ouska was not specific as to the nature of the item that Sanchez was supposed to retrieve from under the mattress. Both Sanchez and Tommy Gonzalez, Sanchez's boyfriend and the brother of Ms. Ouska's boyfriend, each made separate attempts to retrieve this unknown item from the Fontenot home that morning. Each time, Rutledge, who had already found the knife under Ms. Ouska's mattress, would not allow them entry into the Fontenot home. Soon after, the knife was placed in a plastic bag, and the police were called to the scene.

When the police arrived and learned that the knife had been found in Ms. Ouska's room, Detective Michael Shields was dispatched to speak with her regarding the Te murder (Detective Shields and a partner had spoken with Ms. Ouska at the hospital on the previous morning about the details of Ms. Ouska's stabbing). When Detective Shields arrived at the Illinois Masonic Medical Center, Ms. Ouska was about to be released, and she agreed to accompany the detective to the police station. Ms. Ouska was told that she was to look at possible mug shots of her assailant; instead, once at the station, Detective Shields began asking questions relating to Te's murder. At this point, Ms. Ouska immediately stated that she did not wish to speak to the detective any further, indicated that she wished to speak with her attorney and later left the police station. At no time during this questioning was Ms. Ouska placed under arrest, nor was she given Miranda warnings. Additionally, Ms. Ouska had a bag of clothing with her as she left the hospital that she brought with her to the police station. Upon leaving the station, she did not take this bag with her. Detective Shields, who had noticed blood on some of the clothing in the bag, inventoried the bag and its contents and sent it to a crime laboratory./3 Inside that bag, the

police later found a blood-stained jacket and in its pockets found $87 in one- and five-dollar bills, a St. Benedict medal and a small green pencil.

Analysis later revealed that the blood on the knife was consistent with Te's blood and that the knife contained silicon and fibers matching that of Te's prosthesis and clothing, respectively. Testing of the blood found on the two one-dollar bills that Fontenot and her daughter discovered on Ms. Ouska's dresser showed that it was consistent with the protein and enzyme classifications of Te's blood. Additionally, tests on the blood from Ms. Ouska's jacket and from the money located in the jacket were consistent with the protein and enzyme classifications of Te's blood. Blood that had been found in the front room of Te's store was determined to be consistent with Ms. Ouska's blood type, and blood consistent with Ms. Ouska's blood enzyme and protein type was found on the rag recovered from the bathroom sink in the rear of the store. A warrant was then issued for Ms. Ouska's arrest. Six days later, on May 28, 1992, she appeared at a police station and was arrested.

B. Earlier Proceedings
1.

During her jury trial, Ms. Ouska testified that she had entered Te's store on the morning of the murder and saw Fontenot's son-in-law, Salvador Martinez, repeatedly stabbing the victim. Ms. Ouska had, to this point, never told this story to the police or any judicial officer. She maintained that when she told Martinez to stop, he knocked her to the ground, stabbed her in the leg with the knife and threatened that if she told anyone about his crime, he would hurt Ms. Ouska and her child. Ms. Ouska also testified that the knife belonged to Martinez and not to her. After Martinez ran from the store, Ms. Ouska claimed that she quickly pulled the knife out of her leg and put it in the pocket of a sweatshirt that she was wearing. She also maintained that she never entered the rear portion of the store, the area where Te was killed.

Ms. Ouska also provided her version of a number of key points in the sequence of events after the murder. She testified that when she had arrived at Erma Gonzalez's house just after the stabbing, she told Gonzalez that she had been stabbed with a screwdriver because, until she returned to her home, she was unsure of the nature of the object that she had been stabbed with and believed that it could have been a screwdriver. She also explained that she had stated falsely that a

Hispanic man had stabbed her on the street because she was afraid that, if she told the truth, Martinez would endanger her and her child. Lastly, Ms. Ouska maintained that when she called Lenoir Sanchez's apartment on the morning after the murder, she asked Sanchez to retrieve health insurance information from under her mattress, not the knife involved in the murder.

Prior to Ms. Ouska's testimony, the prosecution called Detective Shields to the stand in its case-in-chief. It elicited from him the fact that Ms. Ouska had remained silent when the detective had asked her questions regarding the murder at the police station. He characterized Ms. Ouska's behavior at that time as "uncooperative." R.7-8 at 16C.

Later, on cross-examination of Ms. Ouska, the prosecution again engaged in the following line of questioning regarding Ms. Ouska's pre-arrest, pre-Miranda silence:

[State] And you didn't tell Det. Shields on the [ ]8th at Illinois Masonic Medical Center that Salvador Martinez committed the crime?

A: [Ms. Ouska] No.

Q: You didn't ask for witness protection because you had just seen this woman brutally murdered?

A: No.

Q: When you went to the police station . . . at Area 4 Violent Crimes . . . [y]ou didn't tell Det. Shields or Pavon at that time that Salvador Martinez had committed the crime?

A: No.

R.7-3 at D-233-234. Additionally, the prosecution also referenced Ms. Ouska's actions after her arrest:

Q: [State] You went to bond court; right?

A: [Ms. Ouska] Correct.

Q: And you appeared before a judge?

A: Correct.

Q: Did you tell the judge at that time that you were innocent and Salvador Martinez had committed the murder?

A: No, I did not.

Q: Did you tell the Assistant State's Attorney who

was there that you were innocent and Salvador Martinez committed murder?

A: No, I did not.

* * *

Q: So then you come into Judge Reyna's courtroom; right?

A: Yes.

Q: And the case has been pending within this courtroom for approximately two-and-a-half years?

A: Correct.

* * *

Q: As a matter of fact you decided you would wait until your day of trial?

A: No. I did tell a couple of people.

Q: Well I am just telling you you decided you would wait until your day of trial and reveal in a public courtroom where Salvador Martinez could walk right in here, you decide you would wait until then and tell the ladies and gentlemen of the jury that you were innocent and Salvador Martinez committed murder?

A: Yes.

Id. at D-235-237. Later, in closing argument, the prosecution again made reference to Ms. Ouska's silence regarding her claim that it was Martinez who had murdered Te./4 Ms. Ouska's trial counsel did not object to any of this questioning by the prosecution, with the exception of the remarks in closing argument; even there, counsel only objected on the ground that the assertion was not supported by the evidence. That objection was overruled by the trial court. Ultimately, Ms. Ouska was found guilty of first-degree murder and armed robbery and sentenced to life imprisonment.

2.

   In its review of Ms. Ouska's conviction, the Appellate Court of Illinois first determined that the prosecution's comments during cross-examination regarding Ms. Ouska's pre-arrest silence did not run afoul of the Constitution. It explained only that it found "no error" because those comments addressed events occurring before Ms. Ouska was in custody and during a time when she understood that her participation was voluntary. R.1, Ex.A at 8. The court did not mention the prosecution's reference to Ms.

Ouska's pre-arrest silence during its case-in-chief as part of its questioning of Detective Shields.

The court next addressed the prosecution's references to Ms. Ouska's post-arrest silence during cross-examination and in closing argument. The court noted that Ms. Ouska did not object to these comments during trial and that this "generally constitutes a waiver of any improprieties." Id. at 9. The court then examined the issue for plain error and ruled that the use of the post-arrest silence did not adversely affect Ms. Ouska's right to a fair trial because a substantial amount of evidence existed to connect her to the commission of the crime.

The court also ruled that Ms. Ouska could not make out a claim of ineffective assistance of counsel on the ground that her trial counsel failed to object to the improper use of her silence. It held that Ms. Ouska could not show that, under the second part of the test articulated in Strickland v. Washington, 466 U.S. 668 (1984), but for her counsel's failure there was a reasonable probability that the result of the trial would have been different.

After finding no other defects with Ms. Ouska's trial, the Appellate Court affirmed her convictions and her sentence. The Illinois Supreme Court later denied leave to appeal that decision.

3.

Ms. Ouska then filed a petition for a writ of habeas corpus in the district court under 28 U.S.C. sec. 2254. The district court first addressed the use of Ms. Ouska's pre-arrest silence. It noted that a defendant's Fifth Amendment rights are not violated by the use of pre-arrest silence to impeach a defendant's credibility, and that, because Ms. Ouska ultimately took the stand and testified in her own behalf, the prosecution had used her pre-arrest silence to impeach her credibility and not to establish her guilt./5

The district court, however, also found that the prosecution had made reference to Ms. Ouska's post-arrest silence in violation of her due process rights. See Doyle v. Ohio, 426 U.S. 610 (1976). Nevertheless, it noted that, even if that issue had been preserved for appeal, any error was harmless under the standard of review applicable to habeas corpus petitions set forth in Brecht v. Abrahamson, 507 U.S. 619 (1992). In light of the large amount of evidence suggesting that Ms. Ouska had committed the crimes in

question, and her shifting stories regarding her version of events, the use of her post-arrest silence did not have a substantial and injurious effect or influence on the jury's verdict.

Lastly, the district court found meritless Ms. Ouska's claim that her trial counsel's failure to object to the use of her silence constituted ineffective assistance of counsel under the Sixth Amendment. Like the Illinois Appellate Court, the district court held that Ms. Ouska could not meet the second prong of the Strickland test; she could not demonstrate that the outcome of her trial would have been different if trial counsel had objected to the references to her silence.

As a result, the district court denied Ms. Ouska's petition for a writ of habeas corpus. Ms. Ouska then applied to the district court for a certificate of appealability, but the court declined to grant one. Subsequently, a judge of this court granted a certificate limited to two issues: (1) whether the prosecution's use of Ms. Ouska's post-arrest silence violated her due process rights and (2) whether her trial counsel rendered constitutionally ineffective assistance of counsel by failing to object to the prosecution's use of her post-arrest silence.

II
DISCUSSION

Ms. Ouska now seeks review of the three claimed errors that she presented to the district court. First, she asks that we amend her certificate of appealability and review the district court's holding that the prosecution did not infringe on her Fifth Amendment privilege against self-incrimination by commenting on her pre-arrest, pre-Miranda silence. Ms. Ouska claims that the reference to her pre-arrest silence in the prosecution's case-in-chief, during the testimony of Detective Shields in advance of her own testimony, was an unconstitutional attempt to draw an inference of guilt. Next, she maintains that the use of her post-arrest silence was not only constitutional error, but that the error significantly prejudiced her case and therefore cannot be considered harmless. Lastly, Ms. Ouska contends that her trial attorney's failure to object to these prosecutorial references constituted ineffective assistance of counsel and excuses any procedural default that may have occurred.

A. Applicable Standards of Review

In an appeal from a ruling on a petition for habeas relief, we review a district court's findings of fact for clear error and its rulings

on issues of law de novo. See Foster v. Schomig, 223 F.3d 626, 634 (7th Cir. 2000), cert. denied, Foster v. Neal, ___ S. Ct. ___, 2001 WL 285839 (U.S. Mar. 26, 2001); Gardner v. Barnett, 199 F.3d 915, 918 (7th Cir. 1999) (en banc), cert. denied, Gardner v. Neal, 529 U.S. 1079 (2000). Additionally, because the habeas petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the standard of review contained in that Act governs Ms. Ouska's claims. See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997); Braun v. Powell, 227 F.3d 908, 916 (7th Cir. 2000), cert. denied, 121 S. Ct. 1164 (2001). After AEDPA, the federal habeas statute allows us to grant habeas relief only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. sec. 2254(d); see also Braun, 227 F.3d at 916. "This standard only applies, however, to a 'claim that was adjudicated on the merits in State court proceedings.'" Braun, 227 F.3d at 916 (quoting 28 U.S.C. sec. 2254(d)). We have noted that the Supreme Court has "explained that a state court decision is 'contrary to' Supreme Court precedent 'if the state court arrives at a conclusion opposite to that reached by this Court on a question of law' or 'if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.'" Anderson v. Cowan, 227 F.3d 893, 896 (7th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Additionally, an "unreasonable application" of clearly established Supreme Court precedent occurs "'if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case' or 'if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. at 896 (quoting Williams, 529 U.S. at 407-08). We review whether a state ruling was "contrary to" clearly established law de novo; however, in determining whether a state court decision was an "unreasonable application of" clearly established law, we defer to any reasonable state court decision. See id. at 896-97; Schaff v. Snyder, 190 F.3d 513, 522 (7th Cir. 1999). With that standard of review in mind, we now address Ms. Ouska's claims.

B.  Enlargement of the Certificate of Appealability

Before proceeding further, we shall determine whether, as Ms. Ouska requests, we ought to enlarge the certificate of appealability to include her contention that the prosecution's use of her pre-arrest silence violated her rights under the Due Process Clause.

1.

In issuing a certificate of appealability ("certificate"), the circuit judge limited the issues on appeal to "[w]hether the prosecution's use of Ouska's post-arrest silence violated her due process rights and whether Ouska's trial counsel was ineffective in failing to object to the prosecution's use of Ouska's post-arrest silence." Order of Dec. 21, 1999./6 In her appellate briefs, Ms. Ouska asks us to amend that certificate to include her claim that the prosecution infringed her privilege against self-incrimination by introducing testimony of her pre-arrest, pre-Miranda silence in its case-in-chief.

Pursuant to 28 U.S.C. sec. 2253(c), a petitioner in habeas corpus may only appeal those issues for which a certificate of appealability has been granted. See Porter v. Gramley, 112 F.3d 1308, 1312 (7th Cir. 1997). A certificate may issue only as to those claims for which the applicant has made a substantial showing of the denial of a constitutional right. See 28 U.S.C. sec. 2253(c)(2). We have noted that, if a certificate is granted as to certain issues, but the petitioner is later able to make a substantial showing of the denial of a constitutional right as to a different issue, we shall amend the certificate to include such a claim. See Rodriguez v. Scillia, 193 F.3d 913, 920 (7th Cir. 1999); Williams v. Parke, 133 F.3d 971, 975 (7th Cir. 1997).

The State asks us to refuse to consider Ms. Ouska's request to amend the certificate. It submits that, because Ms. Ouska waited until the filing of her appellate briefs to request that we do so, and because this court has already issued a certificate as to specific issues, we should refuse to amend it now. Consideration of such a request, argues the State, "wastes time and resources and distracts the parties and the court." Appellee's Br. at 10. However, we have often considered requests to amend a certificate to include additional issues, not only when a party specifically asks that we do so in its briefs, see e.g., Schaff, 190 F.3d at 528; Hugi v. United States, 164 F.3d 378, 380 (7th Cir. 1999), but also when a party implicitly makes such a request by simply including issues in its briefs that were not specified in the

certificate, see, e.g., Rodriguez, 193 F.3d at 920-21; Sylvester v. Hanks, 140 F.3d 713, 715 (7th Cir. 1998); Williams, 133 F.3d at 975. Of course, when we have determined that the expansion of a certificate was not warranted, we have noted that "we are not required to and will not" address arguments outside of those issues certified for appeal. Fountain v. United States, 211 F.3d 429, 433 (7th Cir. 2000).

In Porter v. Gramley, 112 F.3d 1308 (7th Cir. 1997), we addressed a similar request by a state. In that case, a district court granted a certificate with respect to only one claim; on appeal the petitioner asked that we expand the certificate to include a separate claim. See Porter, 112 F.3d at 1312. The State of Illinois objected, arguing that the petitioner should first have to make an explicit request for an expansion of the certificate before raising the issue on appeal. See id. We noted that Federal Rule of Appellate Procedure 22(b), which states that when a petitioner makes "no express request for a certificate . . . the notice of appeal constitutes a request [for a certificate]," indicates that, when a district court granted a certificate only as to certain issues, this court should consider a notice of appeal addressing other issues as an implicit request to expand that certificate. See id. As a result, we declined to implement a requirement similar to that which the State asks for here. Moreover, after Porter, we have considered implicit requests to amend a certificate made in a petitioner's briefs, not only when the certificate was issued by the district court, but also when it was issued by our own court. See Rodriguez, 193 F.3d at 920 (noting that this court "may add issues to [a] certificate" that it issued, "if it is deemed necessary"); Sylvester, 140 F.3d at 715 (same)./7

Therefore, as our past precedent dictates, we shall continue to consider requests to amend a certificate of appealability even when they are presented in a petitioner's briefs to this court. We are mindful that the certificate does play an important role as "a screening device, helping to conserve judicial (and prosecutorial) resources." Young v. United States, 124 F.3d 794, 799 (7th Cir. 1997). However, in those rare instances where the importance of an issue does not become clear until later in an appellate proceeding, this court has the authority to consider that issue, even though it is not included in the initial certificate./8

2.

To amend her certificate of appealability, Ms.

Ouska must make a substantial showing that the State's use of her pre-arrest silence at trial violated her constitutional rights. To do so, she must demonstrate that reasonable jurists could debate whether this challenge in her habeas petition should have been resolved in a different manner or that the issue presented was adequate to deserve encouragement to proceed further. See Slack v. McDaniel, 529 U.S. 473, 483-84 (2000); Rutledge v. United States, 230 F.3d 1041, 1047 (7th Cir. 2000), cert. denied, 121 S. Ct. 1207 (2001).

The Illinois Appellate Court limited its review of the prosecution's use of Ms. Ouska's silence to instances of impeachment and did not address the use of that silence in the prosecutor's case-in-chief. We therefore review this issue under pre-AEDPA standards.

In Jenkins v. Anderson, 447 U.S. 231, 238 (1980), the Supreme Court ruled that the Fifth Amendment's privilege against self-incrimination is not violated when the prosecution uses a defendant's pre-arrest silence to impeach that defendant's credibility. The Court reasoned that, although it "can be argued that a person facing arrest will not remain silent if his failure to speak later can be used to impeach him," once a defendant voluntarily decides to take the stand, that individual has an obligation to testify truthfully. Id. at 236-38. At that point, the "'interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'" Id. (quoting Brown v. United States, 356 U.S. 148, 156 (1958)).

Jenkins, however, left open the question of whether pre-arrest silence could be used against a defendant, not for impeachment purposes, but as substantive evidence of guilt. See id. at 236 n.2. We addressed that issue in United States ex rel. Savory v. Lane, 832 F.2d 1011 (1987). Savory involved a defendant who, in a non-custodial setting and without being provided with Miranda warnings, refused to answer any questions from police officers regarding a murder investigation. See id. at 1015. In that case, we concluded that the Supreme Court's opinion in Griffin v. California, 380 U.S. 609 (1965), which had forbidden the prosecution from using a defendant's silence at trial as an inference of his guilt, "applies equally to a defendant's silence before trial, and indeed, even before arrest." Savory, 832 F.2d at 1017. We reasoned that the right to remain silent attached before the institution of adversarial proceedings, and

although "the presence of Miranda warnings might provide an additional reason for disallowing use of the defendant's silence as evidence of guilt, they are not a necessary condition to such a prohibition." Id. at 1018./9 Lastly, we noted that, because the defendant in Savory did not take the stand, the prosecution's motive in referring to his pre-arrest, pre-Miranda silence was to suggest that he was guilty, not to impeach his testimony, as was the case in Jenkins. See id. at 1017.

In this case, the prosecution made reference to Ms. Ouska's pre-arrest, pre-Miranda silence regarding Te's murder, not only during its cross-examination of Ms. Ouska, but also during its case-in-chief. This reference occurred when the State questioned Detective Shields regarding his discussion with Ms. Ouska about Te's death on the day after the murder. In response to the prosecution's questions, Detective Shields noted that Ms. Ouska repeatedly declined to discuss the murder, and he referred to her attitude as "uncooperative." R.7-8 at 16C. The district court ruled that, because Ms. Ouska later testified in the case and provided her own explanation for her silence, the prosecution was free to comment on her pre-arrest silence as a method of impeaching her testimony. See R.18 at 4-11 (distinguishing Savory as a case where the defendant did not take the stand, such that any reference to his silence must have been to suggest his guilt).

Ms. Ouska argues that the prosecution's reference to her silence in its case-in-chief, before she had ever taken the stand, shows that its purpose in using that silence was to demonstrate substantive evidence of her guilt, not to impeach her credibility. Our opinion in United States v. Hernandez, 948 F.2d 316 (7th Cir. 1992), supports this claim. In Hernandez, we held that, when the prosecution makes reference to a defendant's pre-Miranda silence in its case-in-chief,/10 that reference demonstrates that those comments were intended as an inference of the defendant's guilt, even when that defendant later takes the stand. See 948 F.2d at 323. Moreover, we also noted that there was no evidence that the improper references in the prosecution's case-in-chief were made inadvertently. See id. The prosecutor in Hernandez had returned to questions regarding the pre-Miranda silence after an objection by the defense--a fact that we found to demonstrate a deliberate attempt to imply guilt and to show that "the prosecutor here asked his question expecting the answer he got." Id. In Ms. Ouska's case, as in Hernandez, the State made reference to her pre-arrest, pre-Miranda silence in its case-in-chief, before Ms. Ouska ever took the

stand. Moreover, there was no indication that the State's questioning of Detective Shields regarding Ms. Ouska's silence was inadvertent or was otherwise not meant to suggest guilt. The State not only asked Detective Shields a number of follow-up questions regarding Ms. Ouska's silence at the hospital, but also continued to refer to the exchange between the two during its cross-examination of Ms. Ouska.

The State, relying on United States v. Davenport, 929 F.2d 1169 (7th Cir. 1991), argues that Savory's rule against the use of pre-arrest silence does not apply when a defendant agrees to speak with authorities, but then later chooses to stop doing so. Davenport involved two defendants who, aware that they were under investigation by the I.R.S. regarding unusually large deposits they had made, decided to answer an I.R.S. agent's questions regarding the transaction in an attempt to ward off future prosecution./11 See 929 F.2d at 1171-74. After "start[ing] down this path of self-exculpation," the defendants refused to answer other, related questions of the agents; at trial, they invoked their right against compulsory self-incrimination to prevent the admission of any of the comments they made to the investigators. Id. at 1174. We explained that:

The privilege against self-incrimination is not a privilege to attempt to gain an advantage in the criminal process, whether in its investigatory or its trial stage, by selective disclosure followed by a clamming up. Having voluntarily given the agent their version of the events, the [defendants] forfeited their privilege not to answer questions concerning that version.

Id. at 1174-75; see also Williams v. Chrans, 945 F.2d 926, 953 (7th Cir. 1991). However, Ms. Ouska's actions are different than those of the defendants in Davenport in some important respects. Ms. Ouska did not consent to accompany Detective Shields to the police station knowing that she would be questioned regarding Te's murder--instead, she was told that she would be looking at mug shots of her assailant. Moreover, the record demonstrates that once at the station, as soon as the police began to inquire about Te's death, Ms. Ouska immediately ceased the interview, requested her lawyer and later left the station./12 These facts do not suggest a suspect who, as was the case in Davenport, aware that she was being questioned regarding an investigation, attempted to exculpate herself with some answers and then later refused to answer additional questions related to those comments. It is true that at the time of her conversation at the station with Detective Shields, Ms. Ouska previously had told police a

story that attempted to shield herself from inquiry regarding Te's murder; she falsely claimed that she had been stabbed on the street by a Mexican man. However, in light of the fact that, when aware that she was under investigation for Te's murder, Ms. Ouska immediately declined to answer any and all questions, we are doubtful that her previous comments regarding her initial explanation of the stabbing would be sufficient to start her down the "path of self-exculpation" under the meaning of Davenport, 929 F.2d at 1174.

As a result, we believe that Ms. Ouska has made a substantial showing, adequate to deserve encouragement to proceed further, that the State used her pre-arrest, pre-Miranda silence as an improper inference of her guilt, in violation of her constitutional rights. The State, as it had the right to do regarding issues not included in a certificate of appealability, declined to address Ms. Ouska's argument fully in its brief regarding the pre-arrest silence claim. See Schaff, 190 F.3d at 528 n.16; Sylvester, 140 F.3d at 715. Typically at this stage, we would amend the certificate to add this issue and "extend the appellee an opportunity to file a supplemental brief." Sylvester, 140 F.3d at 715. However, for the reasons set forth in Section II.C of this opinion, this step will not be necessary, as any constitutional error in the use of Ms. Ouska's pre-arrest, pre-Miranda silence was harmless. See Brecht, 507 U.S. at 637. Accordingly, we shall not enlarge the certificate of appealability.

C. The Prosecutor's Use of Post-Arrest Silence

In addition to its references to Ms. Ouska's pre-arrest silence, the State also made reference to Ms. Ouska's post-arrest, post-Miranda silence by noting her failure to claim that it was Martinez, and not her, who had murdered Te. In its consideration of this issue, the Illinois Appellate Court relied upon the doctrine of waiver because there had been no objection to these prosecutorial statements at trial. Ms. Ouska must therefore show cause and prejudice before we can consider the merits of this contention. See Jenkins v. Nelson, 157 F.3d 485, 491 (7th Cir. 1998) ("If a state court does not reach a federal issue because of a state procedural bar, that issue cannot be raised in a writ of habeas corpus to a federal court without a showing of cause and prejudice.") (citing Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977)). Ms. Ouska maintains that the ineffective assistance of her trial counsel in failing to object to the use of the post-arrest silence satisfies the standard for "cause and prejudice." See Murray v. Carrier, 477 U.S. 478, 488 (1986).

The Supreme Court has explained that to demonstrate "prejudice" under the cause and prejudice standard, a defendant must "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)./13

We believe that Ms. Ouska has not demonstrated prejudice from any improper use of her post-arrest silence in light of the very substantial other evidence of her guilt. As an initial matter, the evidence demonstrated that Ms. Ouska had the opportunity to commit the murder on the morning of May 7, 1992, and that she was at the murder scene at the time of Te's death. Fontenot, Ms. Ouska's former foster mother, testified that, on the night before and the morning of the murder, she had been arguing with Ms. Ouska about money that Ms. Ouska had borrowed from Te. Fontenot maintained that, on the morning of the murder, Ms. Ouska left home in order to obtain money so that this debt could be repaid. Ms. Ouska left that morning at approximately 9:20 a.m. and returned, bloodied from a wound to her leg, at 10:00 a.m.; testimony established that Te was killed between 9:00 a.m. and 10:00 a.m. Ms. Ouska herself also admits that she was at Te's store, located only two or three minutes from the Fontenot home where Ms. Ouska lived, at the time of the murder. She contends, however, that, when she arrived at the scene, she saw Martinez repeatedly stabbing the victim.

Additionally, significant physical evidence linked Ms. Ouska to the crime scene and the murder. A knife was found under Ms. Ouska's mattress on the day after the murder; the knife contained blood later found to be consistent with Te's blood type and silicon later determined to be consistent with the silicon gel implants that Te wore in her prosthesis. Fontenot testified that only three weeks before, she had seen the same knife in Ms. Ouska's room and that Ms. Ouska explained to Fontenot at that time that she had found the knife in the basement of the house. Fontenot also said that, on the afternoon of the murder, she and her daughter found blood-stained money and a printout of winning lottery numbers from a previous date on Ms. Ouska's dresser./14 The blood on those two one-dollar bills was later found to be consistent with Te's blood enzyme and protein type. Additionally, blood consistent with Ms. Ouska's blood type was found in the front room of Te's store, and blood consistent with Ms. Ouska's blood enzyme and protein type was found

on a rag recovered from the bathroom sink in the rear of the store.

Other evidence found in Ms. Ouska's possession casts doubt on the credibility of her version of events. When the police arrived at the store after Te's murder, the store's cash register was found open and emptied of money. Among Ms. Ouska's personal items, which the police had inventoried after she accompanied Detective Shields to the station on the day after the murder, the police found a blood-stained jacket. The blood on the jacket was later found to be consistent with Te's blood. In the pocket of that jacket was a medal depicting Saint Benedict./15 Teodora Kwong, Te's sister, testified that the medal was the same one that she had purchased in the Phillippines and given as a gift to Te and that Te kept the medal in her cash register at the store. The police also found a small green pencil in the jacket, later identified by Arthur Kwong, Te's brother-in-law, as one similar to the pencils that Te kept in her store for customers to use in filling out lottery slips./16 Lastly, the police discovered $87 in one-and five-dollar bills in the jacket, despite the fact that Fontenot had testified that Ms. Ouska left the house on the morning of the murder to look for money.

Additional evidence also provided reason for the jury to doubt the credibility of Ms. Ouska's testimony. On the morning of the murder, Ms. Ouska was ultimately taken to Illinois Masonic Medical Center to receive treatment for her wounds, and she stayed there until the next day, May 8, 1992. While there, she made repeated phone calls to the apartment of a friend, Lenoir Sanchez, who lived in the building next to the Fontenot home. Sanchez testified that Ms. Ouska asked her to go next door and to obtain "something from under [Ms. Ouska's] mattress," but when Sanchez asked what the item was, Ms. Ouska would not tell her. R.7-4 at 255C. Both Sanchez and her boyfriend Tommy Gonzalez each made separate attempts to get this unknown item from the Fontenot home. However, earlier that morning, under the same mattress, Rutledge had found the blood-stained knife used in the murder. As a result, Rutledge would not let Sanchez or Gonzalez in, and the police were called soon thereafter. Ms. Ouska subsequently testified that she kept her HMO card and paperwork under the mattress, materials that she needed due to her hospital stay, and that she asked Sanchez to retrieve that information. Ms. Ouska also claimed that she did not place the knife under the mattress; she explained that she had left the knife on top of the bed, in the pocket of the sweatshirt she had been wearing that morning,

before she left for the hospital. Despite this alternate explanation, Ms. Ouska's phone calls to Sanchez and her request that Sanchez retrieve "something" from under Ms. Ouska's mattress, the same mattress under which the knife had been found earlier that morning, could have given the jury additional license to question Ms. Ouska's credibility.

Moreover, Ms. Ouska testified that at no point did she enter the rear portion of the convenience store, where Te was stabbed and where Te's body was found. Blood consistent with Te's blood, however, was later found on Ms. Ouska's jacket. Additionally, blood consistent with Ms. Ouska's blood enzyme and protein type was found on a rag recovered from the store's bathroom. The bathroom is located in the rear portion of the store.

Lastly, a number of other aspects of Ms. Ouska's testimony were inconsistent with her previous rendition of events. Between 9:00 a.m. and 10:00 a.m. on the morning of the murder, Ms. Ouska went to the home of her neighbor, Erma Gonzalez, and told Gonzalez that a Mexican man had tried to rob her and had stabbed her with a screwdriver, causing the wound in her leg. Yet, Ms. Ouska later told Fontenot, Rutledge and the police officers who first spoke with her about her injuries that she had been stabbed with a knife, not a screwdriver. Then, at trial, Ms. Ouska claimed that it was Martinez who had stabbed her, not the Mexican man that she had earlier described. Additionally, when Ms. Ouska related her story of the stabbing by the Mexican man to Fontenot and Rutledge, she claimed that, at one point, she had possession of the knife used in the stabbing but had dropped it on the street; Ms. Ouska later testified that she was concealing the knife at that time in her jacket, and that same knife was later found under her mattress.

Ultimately, the evidence supporting Ms. Ouska's guilt in this case was substantial and multi-faceted. That evidence demonstrated that she had the opportunity to kill Te on the morning of May 7, 1992, and that she was at the crime scene when the murder occurred. A number of items that appear to have come from the store, and more particularly its cash register, were found later in Ms. Ouska's clothing, and Ms. Ouska cannot explain how they came to be there. Blood consistent with Te's blood was found on Ms. Ouska's jacket, on money found in Ms. Ouska's room and, most importantly, on the knife found under Ms. Ouska's mattress. Testimony linked Ms. Ouska to the murder weapon and suggested that she attempted to hide that weapon before others could discover it. Moreover, Ms. Ouska's explanation of the events surrounding Te's death were

inconsistent, casting further doubt on her credibility. Lastly, as the district court noted, "there is no evidence that corroborates [Ms. Ouska's] story about Martinez being the one who attacked the victim." R.18 at 13.

Given this evidence, we do not believe that Ms. Ouska can establish that she suffered prejudice by the prosecutor's remarks about her post-arrest silence.

D.  Ineffective Assistance of Counsel

Ms. Ouska also asserts, as an independent ground for relief, that she was deprived of the effective assistance of counsel, guaranteed by the Sixth Amendment, because her trial counsel failed to object to the State's references to her post-arrest silence./17 For the sake of completeness, we now shall address the claim in this context. In order to prevail on a claim of ineffective assistance of counsel, Ms. Ouska must satisfy the familiar test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Ms. Ouska must demonstrate (1) that her counsel's performance was deficient, such that under the circumstances, it was unreasonable under prevailing professional norms and (2) that she was prejudiced by her counsel's deficient performance. See Kitchen v. United States, 227 F.3d 1014, 1019-20 (7th Cir. 2000) (citing Strickland, 466 U.S. at 687-88). This claim is one that was decided on the merits by the Appellate Court of Illinois, which determined that Ms. Ouska could not satisfy the test's second prong, as "the evidence was not closely balanced," and, therefore, "counsel's failure to object [to the use of Ms. Ouska's silence] did not affect the result of the proceeding." R.1, Ex.A at 10. The district court agreed with this determination.

As we have noted earlier, Ms. Ouska filed her petition for habeas corpus on June 1, 1998, after the effective date of AEDPA; therefore, AEDPA applies to her case. See Williams v. Taylor, 529 U.S. 420, 429 (2000); Foster, 223 F.3d at 631 n.2. Under that statute, Ms. Ouska cannot obtain habeas corpus relief on a claim that the Appellate Court of Illinois addressed on the merits, unless that court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. sec. 2254(d)(1). We have noted that when addressing a claim of ineffective assistance of counsel under the AEDPA's deferential standard of review, "'only a clear error in applying Strickland's standard would support a writ of

habeas corpus.'" Franklin v. Gilmore, 188 F.3d 877, 885 (7th Cir. 1999) (quoting Holman v. Gilmore, 126 F.3d 876, 882 (7th Cir. 1997)), cert. denied, 529 U.S. 1039 (2000). This principle applies because "Strickland builds in an element of deference to counsel's choices in conducting the litigation [and] sec. 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." Id. (quoting Holman, 126 F.3d at 881).

Under this standard of review, even assuming arguendo that Ms. Ouska's trial counsel was deficient for failing to object to the use of her silence, any such error would not have prejudiced her. There is no reasonable probability that, but for that error, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. As we have previously discussed in detail, the evidence in the record supporting Ms. Ouska's conviction is considerable. In light of that evidence, we believe that any harm caused by the failure of Ms. Ouska's trial attorney to object to the State's references to her silence would not have changed the result of her trial. Thus, Ms. Ouska cannot satisfy the second prong of the Strickland test, and her claim must fail. The decision of the Appellate Court of Illinois is not "an unreasonable application" of federal law. 28 U.S.C. sec. 2254(d)(1).

Conclusion

Therefore, for the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED


/1 In her petition for a writ of habeas corpus, Ms. Ouska named Odie Washington, then the director of the Illinois Department of Corrections, as the Respondent in this action. Subsequently, pursuant to Federal Rule of Appellate Procedure 43(c), Gwendolyn Thornton replaced Washington as the Respondent; Thornton was later replaced by the present Respondent, Lynn Cahill-Masching. For ease of reference, we shall refer to the Respondent in this opinion as "the State."

/2 The structure of the convenience store where Te worked was described in detail by John Redmond, a forensic investigator and evidence technician for the Chicago Police Department, who arrived at the store soon after the murder to investigate the scene. See R.7-4 at 102C-103C. The store contained a customer area that patrons entered when they passed through the front entrance. A dividing wall separated this customer area from

the rear portion of the store, and there was a small window in the dividing wall where customers received service from store workers, such as Te. The wall included a door that led to the rear of the store; when police arrived after the murder, this door was open, but there was no sign of forced entry. Te's body was found in the rear portion of the store, approximately 25 feet from the door located in the dividing wall.

/3 Ms. Ouska's trial counsel did not file a motion to suppress evidence obtained during the police's search of this bag of clothing. The Appellate Court of Illinois noted that Ms. Ouska voluntarily gave this bag to the police and ruled that the failure of her counsel to file a suppression motion did not rise to the level of ineffective assistance of counsel. See R.1, Ex.A at 11-12. The validity of this search is not disputed by the parties on appeal.

/4 For example, the prosecution noted that "the first time that [Martinez's] name ever pops up to . . . any type of law enforcement personnel, is when she opens her mouth on the stand two and a half years after the murder." R.7-2 at E-70.

/5 The district court presumed that Ms. Ouska was not given Miranda warnings during her visit to the police station and observed that there was "no contention" that this visit, occurring after her release from the hospital, was a custodial interrogation. R.18 at 11 n.1. The court also assumed that Ms. Ouska was given Miranda warnings when she surrendered to police on May 28, 1992. See id. at n.2. The parties do not challenge those assumptions on appeal.

/6 The district court denied Ms. Ouska's request for a certificate of appealability as to each of the issues she raised. See R.22. If a district court declines to issue a certificate, this court may issue one. See 28 U.S.C. sec. 2253(c); Fed. R. App. Pro. 22(b)(2).

/7 Some courts of appeals require that, in order to expand the issues in a certificate, a party must present explicitly the request by motion to the court of appeals; others, as we have done, treat a notice of appeal as an implicit request to amend the certificate. See Jones v. United States, 224 F.3d 1251, 1255 (11th Cir. 2000) (collecting cases). These courts also seem not to distinguish, as we have not, between cases where a court of appeals considers expanding a district court's grant of a certificate and cases such as this, where a court of appeals is asked to expand a certificate that the circuit court itself has granted. See, e.g., Valverde v. Stinson, 224 F.3d 129, 136 (2d Cir. 2000); Hiivala v. Wood, 195

F.3d 1098, 1104 (9th Cir. 1999), cert. denied, Hiivala v. Lambert, 529 U.S. 1009 (2000); Murray v. United States, 145 F.3d 1249, 1250 (11th Cir. 1998).

/8 We also note that when Ms. Ouska made her initial request to this court for a certificate, she did so as a pro se plaintiff.

/9 The circuits are divided regarding the proper answer to this issue. See, e.g., Combs v. Coyle, 205 F.3d 269, 282-83 (6th Cir.) (explaining the circuit split), cert. denied, Bagley v. Combs, 121 S. Ct. 623 (2000). Most recently, the Sixth Circuit joined this court, and the First and Tenth Circuits, in holding that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates that defendant's Fifth Amendment rights. See id. at 283 (explaining that "[i]n a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments . . . might be used in a criminal prosecution; the privilege [against self-incrimination] should thus apply").

/10 In Hernandez, the silence that was used against the defendant involved his refusal to say anything to police after being placed under arrest, but before the Miranda warnings were read to him. See 948 F.2d at 322. Therefore, unlike Ms. Ouska's situation here and the situation in Savory, the alleged Fifth Amendment violation in Hernandez did not involve pre-arrest silence. However, we explained in Hernandez that the Fifth Amendment violation at issue there was distinct from the type of violation that Ms. Ouska now claims with respect to the use of her post-arrest silence. See 948 F.2d at 323 n.4. We noted that the latter claim was addressed by the Supreme Court's decision in Doyle v. Ohio, 426 U.S. 610, 618 (1976), which barred the use of a defendant's silence after Miranda warnings were given, explaining that it constituted a violation of the Due Process Clause of the Fourteenth Amendment. Because Ms. Ouska's pre-arrest silence claim involves the use of her silence before Miranda warnings were given, it implicates our decision in Savory regarding the privilege against self-incrimination, not the rule of Doyle.

/11 In Davenport, the defendants were not placed under arrest and were not in custody, but were read their Miranda rights. See 929 F.2d at 1171.

/12 The opinion of the Appellate Court of Illinois states that when first asked at the station about the knife found under her bed, Ms. Ouska "said she did not want to talk and left the station." R.1, Ex.A at 5. The district court opinion reiterates this fact. See R.18 at 3. Detective

Shields, in his testimony, similarly confirms that, when first asked a question about Te's murder, Ms. Ouska refused to answer any questions about it and then left the police station. See R.7-8 at 16C. For her part, Ms. Ouska also testified that immediately upon being confronted with the knife and asked about the murder, she refused to answer any further inquiries and requested her lawyer. See R.7-3 at D-170. She then went on to state that Detective Shields continued to question her for "[s]ix to seven hours" more, before she was able to get a ride home from the station. Id. at D-171. She was asked no follow-up questions during her testimony as to what, if anything, she said to the detective during this additional questioning.

Ms. Ouska's description of events appears to conflict with the detective's claim that Ms. Ouska left the station right away after being confronted with questions about Te's death. Yet regardless of this discrepancy as to how long Ms. Ouska was questioned, neither she nor the detective asserted that after being first interrogated about the murder, Ms. Ouska did anything but decline to answer any and all questions related to it. Her reply brief clearly states that "Ouska did not continue her conversation with the detective after invoking her Fifth Amendment right" and that she "did not pick and cho[o]se questions she wished to answer or attempt to convince the detective to terminate the investigation." Appellant's Reply Br. at 10. As there is nothing in the record to contradict this explanation, we accept it as true for purposes of this opinion.

/13 Here, Ms. Ouska relies on the alleged ineffective assistance of counsel as "cause" for her failure to object. As we discuss in Section II.D of this opinion, an allegation of ineffective assistance of counsel is governed by the test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Under that test, an individual must show: (1) that her counsel's performance was deficient, such that under the circumstances, it was unreasonable under prevailing professional norms; and (2) that she was prejudiced by her counsel's deficient performance. See Strickland, 466 U.S. at 687-88. We are aware of the continuing ambiguity as to whether a finding of prejudice under Strickland would be sufficient to establish prejudice for the purposes of Wainwright v. Sykes's cause and prejudice analysis. See Fern v. Gramley, 99 F.3d 255, 259 n.4 (7th Cir. 1996); Freeman v. Lane, 962 F.2d 1252, 1259 n.5 (7th Cir. 1992). We need not resolve this issue today because it is clear that under any formulation of prejudice, Ms. Ouska cannot prevail.

/14 Ms. Ouska later testified that the lottery printout did not belong to her.

/15 The Appellate Court of Illinois described this medal of Saint Benedict as "uncommon." R.1, Ex.A at 10. This conclusion appears to have been drawn from the testimony of Rev. Charles Dahm, the pastor of a nearby Catholic church where Te attended Mass on most mornings. Father Dahm described the medal as "not a common medal." R.7-5 at A-190. Ms. Ouska disagrees with the characterization of the medal as unique.

/16 In her testimony, Ms. Ouska claimed that she had never seen the Saint Benedict medal or the green pencil and that they were never in her possession at any time.

/17 Our certificate of appealability limited Ms. Ouska's Strickland claim to the issue of whether her trial counsel "was ineffective in failing to object to the prosecution's use of Ouska's post-arrest silence." Order of Dec. 21, 1999 (emphasis added). However, even if Ms. Ouska's request to expand the certificate to include a claim regarding the use of her pre-arrest silence, see supra Section II.B, also constitutes an implicit request that her ineffective assistance claim be similarly broadened to account for the failure of her trial counsel to object to the use of that silence, we would not find reason to do so. Due to the weight of the evidence supporting her guilt, we do not think that Ms. Ouska can make a substantial showing that her Sixth Amendment rights were violated under Strickland's standard, even taking into account the failure to object to the use of her pre-arrest silence. See 28 U.S.C. sec. 2253(c)(2).